UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                       Plaintiff,

        -against-                             17 Cr. 339 (AJN)

ROBERT DIAZ,

                      Defendant.

---

**SENTENCING MEMORANDUM
ON BEHALF OF DEFENDANT ROBERT DIAZ**

Kelly T. Currie
Joanne R. Oleksyk
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:  (212) 895-4257

*Attorneys for Robert Diaz*

# TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| I. | | Procedural History | 1 |
| II. | | Robert's Personal Background and Characteristics | 3 |
| | A. | An Early Life of Poverty and Poor Education | 3 |
| | B. | Forever Impacted by a Fatal Accident in His Teens | 3 |
| | C. | Early Adulthood: Prison, Education, Employment, Continuing Struggles with Addiction | 4 |
| | D. | Attempts at Sobriety Yield to Deepening Addiction | 5 |
| III. | | The Offense Conduct | 6 |
| IV. | | Sentencing | 7 |
| | A. | The Advisory Guidelines Calculation | 7 |
| | B. | The Sentencing Factors Under 18 U.S.C. § 3553 | 9 |
| | | 1. Overview of Sentencing Factors | 10 |
| | | 2. History and Characteristics of the Defendant | 10 |
| | | 3. The Nature and Circumstances of Offense | 12 |
| | | 4. The Advisory Sentencing Guidelines and Commission Policy | 13 |
| | | 5. The Avoidance of Unwarranted Sentencing Disparities | 16 |
| | C. | A Sentence of 60 Months Fulfills the Goals of Sentencing | 17 |
| V. | | Conclusion | 19 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007)............................................................................................9

*Kimbrough v. United States*,
    552 U.S. 85 (2007)............................................................................................9

*Nelson v. United States*,
    555 U.S. 350 (2009) (per curiam)..................................................................14

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) (JSR) ................................................14

*United States v. Davis*,
    No. 15-CR-382, 2017 WL 3769216 (E.D.N.Y. Aug. 29, 2017)....................15

**Statutes**

18 U.S.C. § 3553(a) ............................................................................... *passim*

21 U.S.C.§ 841(b) .................................................................................. *passim*

21 U.S.C. § 846.............................................................................................1, 2, 16

U.S.S.G. § 3B1.1 .........................................................................................7, 8

**Other Authorities**

Nadia Kounang, *U.S. heroin deaths jump 533% since 2002*, CNN.com (Sept. 8,
    2017) .............................................................................................................12

National Institute on Drug Abuse, *Benzodiazepines and Opioids* (March 2018).........................13

National Institute on Drug Abuse, *Overdose Death Rates* (Sept. 2017) .......................................12

United States Drug Enforcement Administration, *Fentanyl FAQs* .................................................13

United States Sentencing Commission, *Recidivism Among Federal Offenders: A
    Comparative Overview* (Mar. 2016).............................................................17

Defendant Robert Diaz, through his appointed counsel, respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence in this matter.  On February 14, 2018, Robert entered a guilty plea, pursuant to a plea agreement with the Government, to participating in a conspiracy to distribute heroin and other drugs in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B).  In his plea agreement, Robert acknowledged that the use of heroin he distributed resulted in the serious bodily injury of an individual who overdosed after taking the drug.  Accordingly, the plea agreement sets forth a stipulated United States Sentencing Guidelines range of 188 to 235 months' imprisonment.  The pre-sentence investigation report prepared by the United States Probation Department (the "PSR") calculated the Guidelines range to be 262 to 327 months' imprisonment, due to the inclusion of a two-level supervisory role enhancement and a greater criminal history score than estimated in the plea agreement. Notwithstanding this calculation, the Probation Department  recommends  a sentence of 120 months, noting, among other factors under 18 U.S.C. § 3553(a), the profound destructive impact of Robert's lifelong addiction to drugs, and that a Guidelines sentence would unduly diminish chances at rehabilitation.  Under either Guidelines calculation, for the reasons discussed herein, Robert pleads for the leniency of the Court and requests that the Court impose the mandatory minimum sentence of 60 months, which is a sentence sufficient but no longer than necessary to achieve all the relevant goals of sentencing.

## I.     <u>Procedural History</u>

Robert was indicted on May 31, 2017, charged with conspiring to distribute and possess with the intention to distribute over one kilogram of heroin, and smaller quantities of crack cocaine, fentanyl and cocaine, in Rockland County, New York and elsewhere, between approximately 2012 and 2017, in violation of 21 U.S.C.§§ 841(b)(1)(A) and (B).  The indictment further charged that heroin distributed by Robert resulted in serious bodily injury to a victim who

overdosed after using the drug.  Robert was arrested on June 8, 2017 and has been in custody since his arrest.

On February 14, 2018, pursuant to a plea agreement with the Government, Robert pleaded guilty before the Honorable Debra C. Freeman.  As described in the plea agreement, the Government agreed to permit Robert to plead to the lesser-included conspiracy to distribute and possess with intent to distribute over 100 grams of substances containing heroin in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B).  This charge carries a minimum term of 5 years' imprisonment.  As contained in the plea agreement, and as discussed further below, the parties believe that the defendant's advisory Sentencing Guidelines range is 188 to 235 months' imprisonment, with a mandatory minimum term of 60 months' imprisonment.  The plea agreement specifically permits the parties to seek sentences outside the stipulated Sentencing Guidelines range based on the factors contained in 18 U.S.C. § 3553(a).

The PSR sets forth a Sentencing Guidelines range of 262 to 327 months, based on a total offense level of 37 and a criminal history category of III.  PSR ¶ 99.  The Probation Department's Guidelines calculation differs from the plea agreement because it includes a 2013 larceny conviction, placing Robert in a criminal history category of III rather than II, PSR ¶¶ 48-51, and applies two-level supervisory role enhancement.  PSR ¶ 33.  Notwithstanding these increases, the Probation Office ultimately recommended a sentence of 120 months, in large part due to the "profoundly destructive impact that drug and alcohol addiction has had on" Robert's life and because "a guideline sentence unduly diminishes the defendant's chances at rehabilitation."  PSR at 25.

Robert's sentencing is scheduled for July 10, 2018.

## II.    Robert's Personal Background and Characteristics

### A.    An Early Life of Poverty and Poor Education

Robert Diaz was born on June 3, 1968, in Rockland County, New York.  Robert was the youngest of four children and was raised by a struggling single mother.  When Barbara Ludwig, Robert's mother, was pregnant with Robert, she left Robert's father, Angelo Diaz, who was an abusive alcoholic, taking Robert's three older brothers, Ronnie, Angel and Michael with her.  Consequently, Robert had limited contact with his father growing up.

Robert grew up poor.  Despite working in a flower shop and cleaning houses, his mother still had to rely on food pantries to feed her family.  Even then, they sometimes went hungry.  As a child of a single mother of four, Robert spent much of his time with his older brothers.  Robert was just a child when he was first exposed to and used drugs; he smoked his first cigarette at age 7, and started drinking alcohol and smoking marijuana with his cousins around age 9.  He continued using alcohol and marijuana through his adolescence.  School was a difficult and unhappy experience for Robert.  In elementary school, Robert had a physical altercation with the school principal.  After this incident, Robert was placed in special education classes, which, for all practical purposes, halted his education.

### B.    Forever Impacted by a Fatal Accident in His Teens

When Robert was approximately 14, he and his family suffered a horrific and life-altering accident.  Robert and his older brothers Michael and Ronnie were exploring a tunnel the MTA was constructing for a new subway line in Queens.  *See* PSR ¶ 61.  The boys entered the tunnel from an unsecured hole in a sidewalk and climbed across scaffolding 75 feet above the bottom of the tunnel.  *See id.*  Robert watched as Michael fell from scaffolding and disappeared into the darkness below.  Robert tried going down a ladder to look for his brother, but the ladder only went down part of the way.  When Robert came back up the ladder to the scaffolding, he saw

3

that his brother Ronnie was gone.  Although at first Robert thought his brothers were pulling a prank on him, he ran to get help.  Robert later learned that Ronnie, too, had fallen from the scaffolding to the tunnel floor.  *See id.*  Robert's brother Michael suffered serious head injury and was in a coma after the accident.  Ronnie's fall left him permanently paralyzed from the waist down.  *See id.*  Michael eventually came out of the coma, but needed care in a long-term facility and never returned home.  *See id.*  He ultimately contracted hepatitis at the care facility, from which he died a few years later in 1986.  *See id.*

The accident and its aftermath traumatized Robert.  He received no therapy or counseling to help him cope with the anxiety he felt following the tragedy.  After the accident, Robert stopped going to school and began using more drugs and alcohol.  He abused valium that was prescribed ███████████████ after the accident.  As a teen, Robert also observed his oldest brother shoot up heroin in the home.

### C.     Early Adulthood: Prison, Education, Employment, Continuing Struggles with Addiction

After his brother Michael died of hepatitis, Robert began regularly abusing crack cocaine.  He was around the age of 17 or 18.  Within a year of Michael's death, Robert was involved in an alcohol-fueled fight following a rock concert and was convicted of assault (the sole violent conviction on his record) and sentenced to prison.  PSR ¶¶ 43, 71.  Robert made productive use of his time in prison.  He overcame early educational setbacks through diligent work and study, achieving functional reading and writing competence for the first time and earning his GED.  He also took vocational training in floor covering and furniture refurbishing.  When Robert was released from prison in 1990, he first worked as a vacuum cleaner salesman and then had various jobs in selling and installing carpet and floor coverings.

Robert looks back on the decade that followed as one of the happiest periods of his life. He had steady employment and worked his way up from carpet salesman to managing several stores across Long Island.  *See* PSR ¶ 87.  He married and had two sons.  PSR ¶ 67.  He spent a lot of time with his sons, bringing them to work and volunteering as a Scouts Cubmaster.  *See* Chris Diaz Letter, attached *supra* (writing of the time he spent at the flooring store with his father).  However, even during this relatively happy period in his life, Robert was not able to shake his addiction — after just a few years out of prison he relapsed and began to drink and use crack cocaine again.

### D.   Attempts at Sobriety Yield to Deepening Addiction

In or around 1999, Robert's drug use took a turn for the worse.  Robert's use of crack cocaine became heavy, and he began committing crimes with sole purpose of feeding his addictions.  Robert's heavy drug use also led to numerous hospitalizations for drug treatment. Robert recalled being admitted to the Good Samaritan Hospital in Suffern, NY for a 28-day inpatient chemical dependency program and to the Richard C. Ward Addiction Treatment Center in Middletown, NY, for a 30-day inpatient program in 2003.  PSR ¶ 80.  Robert also received a few months of outpatient drug treatment from Samaritan Daytop Village - Rockland County Outreach in 2004.  *Id.*  Despite his drug use and hospitalizations, Robert continued to hold a variety of sales jobs, and even sought vocational training in HVAC installation.  PSR ¶ 84.

Still, sobriety remained out of Robert's grasp.  In 2005, Robert divorced and began his long-term relationship of 13 years with Theresa Keefe, who is a co-defendant in this case.  That same year, Robert and Theresa were caught together breaking into arcade games to take money in Cape May, New Jersey, and Robert received his second term of imprisonment.  PSR ¶ 47.

During this prison term, Robert was no longer using drugs and seemingly was able to control his addition.  When he was released, he continued to build on this progress and joined

NYACTIVE-16497593.3

AA.  After a year sober, he committed to bring AA meetings to Nyack Hospital.  Unfortunately, Robert eventually succumbed again to his addition.  In approximately 2007, Robert's brother Angel died from a heroin overdose, PSR ¶ 61, and in cruel irony, it was after this tragedy that Robert became a heroin-user himself.  PSR ¶ 79.  In 2008, Robert received drug treatment from Westchester Medical Center in Valhalla, NY, and was committed to Nyack Hospital in Nyack, NY for drug and mental health treatment.  PSR ¶ 80.  Nevertheless, his heroin dependency continued.

## III.   The Offense Conduct

Robert's need and desire to procure drugs for his personal drug habit substantially contributed to and informs the offense conduct in the instant case.  As the PSR briefly suggests at ¶ 65, Robert and Theresa Keefe were in a 13-year, live-in relationship akin to common law marriage up to the time of their arrest in 2017.  Theresa was ███████████████, as was her adult daughter, co-defendant Nicole Munderville, who sometimes lived with them.  The three of them worked together, and with others, to sell narcotics at a retail level in order to ███████████ ████████.  The family-like relationship among Robert, Theresa and Nicole is crucial to understanding their respective roles in the charged narcotics distribution conspiracy.  These were three people, connected by familial affections and also ████████████████████.  This was not a hierarchal drug business, as the plea agreement's Guidelines calculation without a supervising role enhancement reflects.  This is also borne out by Robert's lifestyle — he and Theresa rented a small, modest house and drove old cars because any profits from selling drugs were mostly spent to ████████████.  *See* PSR ¶ 94 (reporting no assets).

At the time of his arrest in June 2017, Robert was a regular user of crack cocaine, and a heavy heroin user — using about 1 gram of heroin per day.  Robert knows that drugs have wreaked havoc on his life, and very much wants to take advantage of drug treatment programs

6

available to him while incarcerated in this case.  Specifically Robert requests the Court's

recommendation that he be permitted to participate in the BOP's residential drug abuse program

(RDAP).

Robert has now been in custody for almost a year, first at the MCC and more recently at

the MDC.  He has no disciplinary record while in custody.  Significantly, and, consistent with his

appetite for work and as shown by his long employment history, he is working six days per week

in the MDC as a kitchen cook.

## IV.     <u>Sentencing</u>

### A.     **The Advisory Guidelines Calculation**

Here, the parties agreed to a stipulated advisory Guidelines calculation in the plea

agreement.  PSR ¶ 102.  The advisory Sentencing Guidelines calculation agreed to by the parties

calculates Robert's total offense level at 35 and criminal history category at II, resulting in the

advisory Guidelines range of 188 to 235 months.  Pursuant to the plea agreement, the parties are

precluded from seeking, and Robert does not seek now, downward departures or adjustments

from this stipulated range, but Robert is explicitly permitted to seek variances from the stipulated

Guidelines range based on the balance of section 3553(a) factors.

The PSR differs from the stipulated Guidelines range in two respects.  First, it includes in

Robert's criminal history a 2013 conviction for larceny resulting in a suspended sentence and

one-year conditional discharge, which increases Robert's criminal history category from II to III,

PSR ¶¶ 48, 50-51.  The defense does not dispute the accuracy of PSR's information about that

conviction.  More significantly, the PSR attributes to Robert a two-level enhancement under

U.S.S.G. § 3B1.1(c) for supervising Theresa Keefe and Nicole Munderville in coordinating the

sale and distribution of narcotics.  PSR ¶ 33.  The defense respectfully objects to this

enhancement.

A two-level supervisory role enhancement is applied where a defendant was "an organizer, leader, manager, or supervisor" in the criminal conspiracy.  U.S.S.G. § 3B1.1(c).  The supervisory enhancement should not be applied here because it fails to accurately reflect Robert's role in the offense relative to that of Ms. Keefe and Ms. Munderville.  All three were ███████ involved in selling retail-amounts of drugs in large part to ████████ .  They lived together because of their familial-type relationships, and their interactions were defined by those personal relationships rather than an organized criminal hierarchy.  The PSR contains little to no factual basis for its application of the supervisory enhancement — the PSR excerpts one call where Robert asked Theresa if she had narcotics for a customer, PSR ¶ 15, and contains *no* particular facts as to how he supposedly supervised Nicole Munderville.  To the contrary, it appears from a call excerpted in the PSR that Ms. Munderville had an independent narcotics source of supply to which she introduced Robert.  Mar. 20, 2017 Recorded Call Reference No. 2580, Audio File No. 212 ("I got a new connect, it's, uh, it's Nikki's connect from Queens. Remember she used to get that shit from Queens . . . .") (call excerpted at PSR ¶ 23).  This does not demonstrate Robert's supervisory role over anyone, let alone Ms. Munderville.  Both the nature of the relationships among Robert, Ms. Keefe and Ms. Munderville and the lack of evidence cited in the PSR make clear that the supervisory enhancement should not be applied to Robert.

The Guidelines' supervisory enhancement exists not only to address concerns of relative responsibility, but also because persons who exercise a supervisory role "tend to profit more from [the offense] and present a greater danger to the public. . . ."  U.S.S.G. § 3B1.1 Commentary, Background.  Those concerns are not present here.  Robert made no substantial profits from his involvement in the distribution of narcotics.  As the PSR reports, Robert has

8

debts, but no assets.  PSR ¶¶ 94-97.  The narcotics sales supported his considerable drug habit

and his and Theresa's very modest living expenses, and there is nothing in the record suggesting

he made more profit than Ms. Keefe or Ms. Munderville.  Nor did Robert engage in any violence

in connection with the offense conduct or possess any firearms.  That there is no indication that

Robert reaped greater profits from the narcotics conspiracy or presented any greater danger to the

public than the other defendants who sold narcotics weighs against applying the supervisory

enhancement to Robert.

The absence of the supervisory role enhancement in Robert's plea agreement further

supports that it should not be applied here.  The Government took a consistent position in its

sentencing submission for Theresa Keefe, explaining that her plea agreement did not contain a

mitigating role reduction because "at [] times, [Robert's relationship with Ms. Keefe] may not

have been ['supervisory'] given their personal relationship, their cohabitation, and their shared

personal resources."  Government's Sentencing Letter, ECF No. 158, at 3 n.3 (filed May 1,

2018).

Accordingly, for all these reasons, a two-level supervisory enhancement should not be

applied to Robert, and the appropriate total offense level in the instant case is 35, not 37.

### B.      The Sentencing Factors Under 18 U.S.C. § 3553

Whichever calculation of the Guidelines the Court endorses, the Court must of course

impose a sentence sufficient, but not greater than necessary, to achieve the objectives of

sentencing. 18 U.S.C. § 3553(a); *see Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *Gall v.

United States*, 552 U.S. 38, 54-57 (2007).  We respectfully submit that in Robert's case, the

mandatory minimum sentence of 60 months' imprisonment is sufficient, but not greater than

necessary to achieve the objectives of sentencing, and request that the Court impose that

sentence.

### 1. Overview of Sentencing Factors

The goals of sentencing as set forth in section 3553(a)(2) are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).  In making an individualized assessment necessary to meet the goals of sentencing, the Court must contemplate, consider, and give appropriate weight to the following factors, pursuant to section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4-5) the applicable sentencing Guideline range and Sentencing Commission (the "Commission") policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  *See*  18 U.S.C. § 3553(a)(l)-(7).  These factors in concert show that a sentence sufficient, but not greater than necessary, to meet all the sentencing goals of section 3553(a)(2) is substantially below the advisory Guidelines range, and that the statutory minimum sentence of 60 months addresses each of the statutory sentencing goals.

### 2. History and Characteristics of the Defendant

Robert's early introduction to drugs coupled with tragedies in his childhood set him on the path of recurrent drug use and deepening addiction, to which the offence conduct is inextricably linked.  Having been introduced to marijuana and alcohol in elementary school, drug use was unfortunately normalized for Robert at a very young age.  Robert's multiple stints in in-

10

patient and out-patient facilities for his drug use and concomitant psychological problems evince the toll his deepening addiction had on his life, as does his criminal history of property crimes to feed his habit.

Though Robert has been on a path set by addiction for a long time, his young adult life contained a number of happy and productive years.  He is determined to have that again.  Robert has a long employment history where he moved up the ranks from salesman to store manager to regional manager.  He has always had a strong work ethic, and has tried to improve his job prospects by enrolling in vocational training in HVAC installation and applying to a laborer's union.  Robert's demonstrated ability to succeed in the workforce underscores that his involvement in the offense conduct was driven largely by his addiction, rather than lack of options, and bodes well for a productive re-assimilation into society when he completes his custodial sentence.

Robert knows that he faces substantial time in prison. His decision to plead guilty represents his whole-hearted acceptance of responsibility for his behavior and its consequences. Having done so, his thoughts are turned towards making productive use of his custodial sentence to prepare for the future once he is released.  Robert hopes and expects that his time in prison will be what it takes to finally defeat his addictions, and he looks forward to taking full advantage of drug treatment programs at his designated facility.  Robert knows that overcoming his addictions will allow him to pursue gainful employment in the industries in which he has experience (such as carpet and flooring sales) when ultimately he is released.  Robert is grateful for the support of his family, including his elderly mother, *see* Barbara Ludwig Letter, attached (expressing her hope that Robert receive longer-term treatment to address his addiction), and his disabled brother Ronny, with whom Robert can live following his release.  S*ee* PSR ¶ 72.

Robert is also looking forward to reconnecting with his young-adult sons in the future and becoming a man they can be proud to have as their father.  In a letter of support to the Court, Robert's son Chris looks ahead to his father attending the milestone events of his life.  *See* Chris Diaz Letter, attached *supra*.

### 3. The Nature and Circumstances of the Offense

Robert has pleaded guilty to a serious crime, one which led to the overdose of another drug user.  Robert takes full responsibility for his actions and in no way seeks to minimize any aspect of his conduct.  There is no denying that Robert was aware of the danger heroin posed, as he lost his own brother to a heroin overdose in 2007.  Robert's distribution of heroin was not in indifference to this risk, and he did not intend to harm any of his customers, many of whom he considered his friends.  This is evident from Robert's own use of the narcotics that he purchased and distributed to his customers and communications where Robert warned others of the drugs' potency so they would take care when using it.  PSR ¶ 20 (Robert "cautioned CARDENAS that they had to be 'careful cause … that sh** will kill you …'"), PSR ¶ 22 (Robert told Ronald Bolanos "'you gotta watch it with that sh**, but people like it cause it's strong.'").

In determining the appropriate sentence in this case, the Court should consider the context and circumstances surrounding the serious bodily injury at issue – that is, the drug overdose of the person identified in the PSR as "Victim 1" in December 2016.  PSR ¶ 18. Without minimizing the seriousness of Victim 1's overdose, the fact of the overdose itself and the circumstances that led to it do not indicate any unusually egregious conduct by Robert. Robert gave Victim 1 the same heroin he purchased for and used himself, so there is no indication whatsoever of any intent to harm the victim or indifference to the results of the victim's using the heroin.  Moreover, the evidence does not indicate anything uncommon about the particular heroin he provided Victim 1.  Rather, the medical records here indicate that the

12

victim used not only heroin but also benzodiazepines (*i.e.*, Xanax) and cocaine – drugs that he did *not* receive from Mr. Diaz – which contributed to his overdose.  Excerpts of Victim 1's medical records, Exhibit A (under seal), at US_001262 (clinical impression showing diagnosis of benzodiazepine overdose in addition to opioid overdose), US_001268 (discharge summary stating "Urine tox positive for benzo, opiates, cocaine"), and US_001496 (laboratory results showing urine positive for benzodiazepines, cocaine and opiates).  Opiates and benzodiazepines, which both suppress breathing, can be a particularly lethal combination.[1]  Here, Victim 1 thankfully survived this overdose.

### 4.    The Advisory Sentencing Guidelines and Commission Policy

In connection with sentencing, the Court first must independently determine the advisory Sentencing Guidelines range.  While the Court is required to consider the advisory Guidelines range, together with other sentencing factors, it may not presume that the advisory Guideline range is reasonable. *See Gall*, 552 U.S. at 49-50; *Nelson v. United States*, 555 U.S. 350, 351-52 (2009) (per curiam) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original); *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (JSR) (holding that "where, as here, the calculations under the Guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.").

---

[1] *See, e.g.,* National Institute on Drug Abuse, *Benzodiazepines and Opioids* (March 2018), *available at* https://www.drugabuse.gov/drugs-abuse/opioids/benzodiazepines-opioids  (stating that more than 30% of overdoses involving opiates also involve benzodiazepines); https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates, note 2 (showing a 5-fold increase in the number of deaths involving both benzodiazepine and heroin between 2002 and 2015).

As set forth in the plea agreement, the parties stipulated that, pursuant to U.S.S.G. § 2D1.1(a)(2), the applicable base offense level is 38 because of the serious bodily injury (the nonlethal overdose) suffered by Victim 1, yielding, without a supervisory enhancement and with acceptance of responsibility, a total offense level of 35.  This calculation results in an advisory range of 188-235 months with criminal history category II and 210-262 months at category III.[2] We respectfully submit, however, consideration of all of the §3553(a) factors shows that a sentence within the advisory range would be wholly unreasonable, and would hinder, rather than further, the goals of sentencing.

Indeed, the Probation Department, in recommending a variance from the Guidelines sentence, pointed specifically to "the profoundly destructive impact that drug and alcohol addiction" has had on Robert, and noted that "a guideline sentence unduly diminishes the defendant's chances at rehabilitation, and is therefore greater than necessary to adequately address the sentencing objectives" of §3553.  *See* PSR ¶ 116 and at 25.  The Probation Department ultimately recommends a sentence of 120 months, representing a 142-month variance from the bottom of the Guideline range it calculated.  *See* PSR ¶ 99 and at 25.

In determining an appropriate downward variance here, the Court can appropriately consider the advisory Guidelines range that would have applied if the base offense level were determined by the drug quantity table under U.S.S.G. § 2D1.1(c), rather than by the serious bodily injury suffered by Victim 1, which provides for a base offense level of 38.  The likely base offense level under such a calculation would be level 30, corresponding to distribution of at least 1 but less than 3 kilograms of heroin.  *See* U.S.S.G. § 2D1.1(c)(5).  With acceptance of

---

[2] The Probation Department calculated an even higher advisory Guideline range of 262-327 months, finding a total offense level (including a supervisory role enhancement) of 37, and criminal history category III.  *See* PSR ¶99.

responsibility (and no supervisory role enhancement), the total offense level would be 78-97 months at criminal history category II and 87-108 months at category III. We respectfully submit that this range is an appropriate starting point from which to consider additional factors favoring a variance to the mandatory minimum 60 months, as discussed further below.

In addition, the Court should also consider in gauging a downward variance that Robert's criminal history category (whether it be the agreed-upon category II in the plea agreement, or the category III as calculated in the PSR) overstates the seriousness of his criminal history. All but one of Robert's arrests or convictions were for non-violent offenses, and the single violent offense – an assault conviction arising from a fight following a concert – occurred over 30 years ago when he was just 18 years old, and under the influence of alcohol and drugs. *See* PSR ¶¶ 43, 71. All of Robert's non-violent offenses such as theft and criminal mischief were plainly the actions of a man driven by his addiction. His conviction in 2013 for larceny is illustrative: in that case, Robert was arrested breaking into an automated photo booth from which he stole a large number of $1 bills, demonstrating the petty and desperate nature of his crimes fueled by his drug addiction. PSR ¶ 48. His crimes were never designed to make him rich; rather, they were committed with the single-minded purpose of securing enough cash to fund his next drug purchase.

Thus, either the Guidelines calculation in the plea agreement or the PSR will result in a substantially longer than necessary sentence here, and accordingly, would run afoul of the fundamental sentencing objectives codified in Section 3553(a). The defense submits that Robert's predominantly non-violent criminal history, in conjunction with his personal background and characteristics and the circumstances of the instant offense conduct, warrant a greater variance downward from the Guidelines range than that recommended by the Probation

15

Department.  The defense respectfully submits that a variance down to the mandatory minimum of 60 months is an appropriate and just sentence in this case.

### 5.    The Avoidance of Unwarranted Sentencing Disparities

A downward variance to the mandatory minimum of 60 months' imprisonment would not create inordinate sentencing disparities.

First, substance abuse dependent defendants convicted of narcotics distribution conspiracies routinely receive sentences below the Guidelines range.  For example, in *United States v. Davis,* the defendant suffered a long history of substance abuse dependency and criminal convictions and pleaded guilty to a narcotics distribution conspiracy under 21 U.S.C. §§ 841(b)(1)(C) and 846.  No. 15-CR-382, 2017 WL 3769216 (E.D.N.Y. Aug. 29, 2017) (Weinstein, J.).  The court recognized that "the defendant's addiction is responsible for much of his illicit conduct" and sentenced him to *less than half* of the low end of his Guidelines range. *Id.* at *3 (sentencing defendant to 60 months in custody in light of Guidelines of 130-162 months).

Nor would a below-Guidelines sentence create disparities with other sentences where bodily harm of another resulted from the defendant's sale of narcotics.  In another case prosecuted in this District, *United States v. Williams*, the defendant pled guilty to a narcotics distribution conspiracy under 21 U.S.C. §§ 841(b)(1)(A) and 846 for distributing "*heroin and fentanyl that resulted in multiple victims suffering death and/or serious bodily injury*." Government's Sentencing Letter, No. 16-cr-00464-NSR, ECF No. 38, at 1 (S.D.N.Y. filed Feb. 9, 2017) (emphasis in original).  The Government and Williams further "stipulated that a dangerous weapon was possessed (based on the two loaded firearms recovered from his residence), and that the defendant was an organizer, leader, manager, or supervisor of the conspiracy."  *Id.* at 2.  Even so, Williams was sentenced to 144 months, less than the advisory

16

Guidelines range of 151-188 months.  *Id.* at 1; Sentencing Hearing, No. 16-cr-00464-NSR (Feb.

10, 2017).  By comparison with the defendant in Williams, therefore, a sentence for Robert—

who did not possess firearms in furtherance of the conspiracy nor, as we submit, supervise any

member of the conspiracy—below the Guidelines and below the Probation Department's

recommendation would be consistent with other sentences where serious bodily injury resulted

from narcotics distribution.

Lastly, a below-Guidelines sentence would not create any sentencing disparities with the

other defendants in this case, three of whom have been sentenced to date, and all of whom

received below-Guidelines sentences.[3]

## C.    A Sentence of 60 Months Fulfills the Goals of Sentencing

The Court must ensure that Robert's sentence meets the goals of sentencing, as set forth

in 18 U.S.C. § 3553(a)(2)(A)-(D).  In particular, § 3553(a)(2)(B) provides that the sentence

should "afford adequate deterrence to criminal conduct" and § 3553(a)(2)(C) provides that the

sentence should "protect the public from further crimes of the defendant[.]"  Robert is

determined to beat his addiction and never return to prison.  He has never before faced a sentence

---

[3] Theresa Keefe, Robert's partner in the narcotics conspiracy, pleaded to a violation of 21 U.S.C. § 841(b)(1)(C) and stipulated in a plea agreement to a Guideline range of 46-57 months' imprisonment.  *See* Government's Sentencing Letter, ECF No. 158, at 1 (filed May 1, 2018).  The Probation Department calculated her Guidelines range to be 70-87 months' imprisonment, but recommended a sentence of 36 months' imprisonment.  *Id.* Ms. Keefe ultimately received a sentence of 40 months' imprisonment.  *See* Judgment, ECF No. 160 (filed May 4, 2018).

Ronald Bolanos, another co-defendant, pleaded to a conspiracy to distribute narcotics in violation of 21 U.S.C. § 841(b)(1)(B) and stipulated to a Guidelines range of 100-125 months' imprisonment. *See* Government's Sentencing Letter, ECF No. 177, at 3 (filed June 14, 2018).  The Probation Department calculated his Guidelines range to be 130-162 months' imprisonment, but recommended a sentence of 96 months' imprisonment.  *Id.* Mr. Boanlos ultimately received a sentence of 80 months' imprisonment.  *See* Judgment, ECF No. 187 (filed June 21, 2018).

Pablo Perez, another co-defendant, pleaded guilty to a conspiracy to distribute narcotics in violation of 21 U.S.C. § 841(b)(1)(B) and stipulated to a Guidelines range of 188-235 months' imprisonment.  *See* Government's Sentencing Submission, ECF No. 189, at 4 (filed June 24, 2018).  The Probation Department recommended a sentence of 96 months' imprisonment.  *Id.* Mr. Perez ultimately received a sentence of 90 months' imprisonment. *See* Judgment, ECF No. 194 (filed June 28, 2018).

17

of the magnitude of even the mandatory minimum sentence, let alone the stipulated Guidelines range.  Facing the possibility of such a sentence at age 49 has brought Robert to the realization that he could die in prison, never to see his family as a free man again.  This jolting prospect is the greatest deterrent of any future illegal behavior, should Robert be given the chance.

In five years, Robert will be 54 years old.  This age is significant because the Commission has found offenders who are 51 or older at the time of release have a lower recidivism rate than any other age bracket, other than those released when they are younger than 21.  United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comparative Overview*, at 23 (Mar. 2016).[4]  Yet at 54, Robert would still be able to return to the work force with many productive years ahead of him.  Conversely, a sentence within the advisory guideline range, or even a sentence of 120 months recommended by the Probation Department, would result in Robert's release at an age when it would be far more difficult to find employment and the stability that regular work would bring, which we submit would be critical to Robert maintaining  sobriety.  Robert's prospective ability to find work upon release after 60 months provides added deterrence from criminal conduct.  Consequently, a sentence well-below the Guidelines range will accomplish the goal of specific deterrence.

A sentence of 60 months is also more than adequate to provide Robert the substance abuse treatment he needs, as BOP's RDAP program typically lasts 9-12 months.  *See* 18 U.S.C. § 3553(a)(2)(D).

Lastly, a sentence of 60 months' imprisonment is a lengthy period of time that reflects the seriousness of the offense and promotes respect for the law, as set forth in 18 U.S.C. § 3553(a)(2)(A).  The mandatory minimum sentence provides just punishment here.

---

[4] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

V.    **Conclusion**

Robert has pleaded guilty to a serious crime and he accepts responsibility for the consequences of his actions.  He knows that no matter what sentence he receives, he faces a substantial amount of time in prison.  However, a just punishment is one that accounts fully for the circumstances that led Robert to Your Honor's courtroom and recognizes that the advisory Sentencing Guidelines overstate what an appropriate punishment for Robert would be.  Up to this point, Robert has had a life-long struggle with addiction.  Even so, he recognizes that his own poor choices have caused another serious harm and oblige him to remain in custody at least until he has served 60 months.  Robert intends to use those 60 months to put his substance abuse squarely in the past so he can focus on his future.

Accordingly, for all the foregoing reasons, Robert seeks the Court's wisdom and mercy and asks for an opportunity to re-establish a law-abiding life and a meaningful relationship with his now young-adult sons as soon as the law will allow by sentencing him to the mandatory minimum term of imprisonment of 60 months.

Respectfully submitted,

/s/ Kelly T. Currie
Kelly T. Currie
Joanne R. Oleksyk
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 895-4257

*Attorneys for Robert Diaz*

19

# LETTER ATTACHMENTS

The Honorable Alison J. Nathan
United States District Judge

Dear Judge Nathan:

  I understand that Robert Diaz has entered a guilty plea, and I understand that Robert is going to be sentenced in May 2018. I would like to provide information about Robert, so you can learn more information about him.

  My name is Christopher Diaz, and I am Robert's son. I am currently attending the State University of New York at Cortland, and majoring in Physical Education with a concentration in Adapted Physical Education. Growing up it was very hard to see my dad because of him being in and out of jail, and once he was out for a while, I was very busy with work or playing sports. The last couple of months before being arrested we saw each other often because he had his own place to live. Once he was arrested we stayed in contact for a little, but then stopped until he transferred jails and got his property and started working to have money to call me.

  Growing up Robert lost two of his brother's one from a tragic accident and one from an overdose. His parents have been separated since before i was born. Both his parents lack education and other parenting skills needed to guide your children in the right path, which did not help when Robert began doing things he shouldn't.

  Robert has always been a hard worker when he gets the chance to work. When I was younger, my dad was a manager at a flooring store, where I would always go to work with him. Since he destroyed his record it has been hard for him to find work. After talking on the phone the other day, he said he wants to learn a new profession in jail that he hopes he can work in once he's out.

  Like I mentioned in the beginning, I understand Robert decided to admit his guilt and take responsibility for his conduct, I feel this is the right thing to do and teaches me that no matter what, if you do something, you be a man and take the blame. I hope that my father is able to receive a longer time for drug rehab and preparing him for a job rather than sitting in a jail cell. I believe this will lead him to becoming the father figure that I need and hopefully the opportunity to attend my college graduation and wedding in the future. Thank you for your time.

          Sincerely,

          Christopher Diaz

Dear your Honor,                                              5-  -18

Before you sentence my son Robert Diaz, please take into Consideration, his criminal record since he was a young teenager. Drugs were a contributing factor, each time that he was arrested.

Throughout the years, he has gone into rehabilitation centers, but it was only 28 days. None of the programs helped him. If he were to go to a rehabilitation program that was longer and more structured, he would be able to be a productive member of society, that he would like to be.

Because he did not have good private heath insurance, he was unable to go into a long term facility. He desparately needs to get into long term rehabilitation, so that he can get off drugs for good.

As his mother, I am begging you to please not send him to prison for too long. He needs to be sent to a long term facility that is strict, so when he gets out, he can finally start a new life that is free of drugs. He can turn his life around and finally be free from so many mistakes. Thank you.

                                        Respectfully Yours,

                                        Barbara R. Ludwig